Nelson, J.,
delivered the opinion of the court:
Peter Townsend, Sr., died in Sumner county, in March, 1825, leaving a widow, Lucretia, and four children, all of whom were minors except George W., who died in the succeeding May, intestate, unmarried, and without issue. The other three children were aged as follows, viz.: Joseph W. H., about fifteen; Elizabeth H., who afterwards married B. L. Wynne, about seven or eight, and Peter, about five years. Mrs. Wynne was married in 1831, and died in 1836, leaving her husband and two children as her survivors. Peter Townsend, the elder, was, at the time of his death, the owner of a considerable real and personal estate, including slaves and other valuable property. Administration on his estate was granted by the county court of Sum *201 ner, at August session, 1825, to Ms widow, Lucretia, and one John Lauderdale, and Lauderdale and John Booker were, at the same time, appointed guardians of the minor children. The widow, Lucretia, intermarried with said’ Booker, in August, 1826. An inventory of the sale and personal estate was returned by the administrator and administratrix, at August term, 1.825; a report of sales made at February term, 1826, and on the 10th of May, 1828, they made a settlement with commissioners appointed by the county court, to be recorded. At the November term, 1825, commissioners were appointed to divide, lay off and allot to the heirs of Peter Townsend, deceased, their proper share of the negro estate of the deceased, which was done 6th of December, 1825, and their report confirmed at February term, 1826.
The guardians made a report 13th of February, 1826, showing that they had, in their possession, ten slaves and notes to the amount of $35,081, belonging to their wards. At February term, 1831, commissioners were appointed to make partition of the land and negroes, so as to give Joseph W. -H. Townsend his share thereof, which they did 22d of February, 1831, and the report was confirmed 10th May, 1831. On 15th November, 1831, commissioners were appointed to divide the negro property between the two minor heirs, Elizabeth "Wynne and Peter Townsend, and report to the next court. This, partition was made 31st December, 1.831, and, at February term, 1832, ordered to be recorded, and it seems to be conceded in the pleadings that final settlements were duly made by the administrators and guardians, although these are not set out in the transcript of the record.
John Booker removed from Sumner to Tipton county, in June, 1858, having previously made his last will and testament, without date, but which was duly proved and recorded at July term, 1858, of the county court of said *202 county, and of which the said Joseph W. H. Townsend, who was his son-in-law, was duly qualified executor.
At the December term, 1858, of the county court of Sumner, it appeared from a copy of the record from said court “that the last will and testament of Peter Towmsend, Sr., deceased, was produced in open court for probate, and was duly proved by the oath of Thomas Stone, one of the subscribing witnesses thereto, and was, therefore, ordered to be recorded;” and Peter Townsend, Jr., was duly appointed administrator with the will annexed. The will is dated 12th March, 1825.
On the 8th of January, 1859, a bill wTas filed in the chancery court at Covington, in this state, by Peter Townsend, Jr., Thomas W. Wynne, administrator of Elizabeth Wynne, and Peter Wynne, against Joseph W. H. Townsend, executor of the last will and testament of John Booker, deceased, and Theresa, his wife [wife of Joseph W. BE. Townsend], Lucretia Booker, his widow [widow of John Booker, deceased], and various other persons, being the legatees and devisees of the said John Booker, in which among many other things, it was charged that the said Peter Townsend, Sr., had devised the greater part of his estate, including a tract of 300 acres of valuable land, niner teen or twenty slaves, and other personal property, to his wife, Lucretia, during her natural life or widowhood only; that after his death she had fraudulently concealed and suppressed his will until her intermarriage with Booker, who, also, fraudulently concealed and suppressed the same until his death. The complainants in said' bill detail at length all the circumstances connected with the suppression of said will, the administration, guardianship and settlement of the estate; propound numerous searching interrogatories to the widow; make all necessary parties defendant; ask that the slaves on hand be delivei’ed up; and pray for an account, etc. The bill was not answered by Mrs. Booker, who died- about the *203 — day of-. It was fully answered by various other parties. Testimony was duly taken and a decree pronounced in favor of complainants, and the cause was removed by writ of error to the supreme court at Jackson, where it was heard at April term, 1867, and is reported in 4 Cold., 70-87, in the names of P. Townsend, Jr., et als. v. J. W. H. Townsend, ex’r. et als.
It is not material to recite here all the proceedings in said suit, but the case now before us, which grew out of it, arose as follows: It was held, in the opinion of the supreme court, at Jackson, that “the chancery court has no jurisdiction, either to set aside the probate of the will, or to give any additional force or validity to it; and it must, for the present at least, be treated as a valid testamentary paper, subject, however, to be repropounded for probate in the county court of Sumner county.” 4 Cold., 84. In the same opinion the court say: “We feel constrained to remand this cause, and direct that the execution of the decree on the account be suspended with leave to the defendants, within three fnonths from the rise of this court, to take such steps as they may deem necessary, in the county court of Sumner county, to set aside the probate of the will, and, on failure to do so, the chancellor shall proceed to execute the decree; otherwise the decree shall remain suspended until the litigation growing out of the proceeding to set aside the probate shall be terminated.” 4 Cold., 85, 86.
-In accordance with this opinion, a decree was pronounced, declaring, among other things, “that the probate of the alleged will in Sumner county court, in December, 1858, and the letters issued thereon, and the grant of letters of administration on the estate of Elizabeth Wynne, although all done after the time prescribed by the statute, must stand until set aside or vacated or appealed from, by a proper proceeding in Sumner county; and that, consequent- ■ ly, so long as they stand unrevoked or unvacated or unappealed from, they furnish ground on which a court of chan *204 eery can base a decree for an account in favor of persons claiming.”
The court does not decide said probate and grants of letters of administration to be valid and effectual, but does decide that, being made, they are sufficient grounds to base a bill for an account until their inability is properly shown, and the court, therefore, to this extent, allows the other causes of demurrer. The report' of the clerk and master, in the chancery court at Covington, as' to the account, not having been excepted to, was affirmed, and it was ordered that “the same shall stand as the true amount to be recovered, if after further proceedings, as hereinafter provided for, the liabilities of the defendants shall be held to be finally established.” It was further declared in said decree: “In order that the defendants may have an opportunity to vacate or annul or to appeal from, or to otherwise test said proceedings, so had in the county court of Sumner county, or to try an issue upon said alleged will, all questions arising on the said points are left open to be adjudicated by proper proceedings in said county by the defendants or any of them. And to that end it is ordered that the execution of this decree be suspended for three calendar months from the adjournment of this court, within which time said proceedings may bo commenced, and upon a notification thereof, in writing, to the clerk and master of the chancery court at Covington, all further proceedings in this cause shall stand suspended until said other proceedings are ended, after which time defendants, or any of them, shall Lave leave in this suit, by supplemental or other proceedings, to get the benefit of the decision upon such proceedings as may be had in Sumner county.”
On the 17 th of August, 1867, a petition addressed to the judge of the county court of Sumner, sitting at Gallatin, was presented in said county court in the name of the heirs and devisees of John Booker and of Joseph W. H. Townsend, Sr., and as executor of John Booker, against the heirs *205 and administrator of Elizabeth Wynne, deceased, who was a daughter of Peter Townsend, Sr., the administrator de bonis non of Lucretia Booker, and “Peter Townsend, in his own right and as administrator cum testamento of l^eter Townsend, Sr.” Petitioners pray that said probate may be annulled and vacated.
A petition addressed “To the worshipful county court of Sumner county, Tennessee,” by J. W. IT. Townsend, and sworn to before a justice of Tipton county, on the 27th of July, 1867, also appears in the transcript, in which he states that he “has spared neither money nor time to resist the claim of complainants, and feels unwilling, and hereby positively refuses to take any steps or to be_ a party to any legal proceedings to disturb the probate of the will of his deceased father, Peter Townsend, Sr., and distinctly states that he has never authorized any person to institute any proceedings in his name for that purpose, and respectfully asks the court to dismiss said petition, filed for the purpose of disturbing the will of his father, as to him, your petitioner.”
Answers were duly filed in the county court to the petition to set aside the will. A motion was made, lipón the one side, to dismiss the petition, and, on the other, to set aside the probate and to revoke and annul the letters of administration with the will annexed granted to Peter Townsend, and the letters of administration issued to Thomas W. Wynne, because more than twenty years had elapsed before the grant of said letters and the estate had been settled up and distributed; which motions were certified to the clerk and master of the chancery court at Covington, as contemplated by the decree of the supreme court. On the 13th of September, 1867, the cause was heard by the county judge, who dismissed the petition, with costs, on the grounds that the will had been fraudulently suppressed; that the name of J. W. H. Townsend was improperly used *206 in the petition; and that the petitioners being strangers to the will and estate, had no right to contest the same1.
From said decree an appeal was prosecuted to the circuit court of Sumner, it having been agreed in the county court, that either side might read all, or any part of the record in the said cause in the chancery court at Covington, and in the supreme court, as original evidence in this' cause, “subject to incompetency.”
The case was heard in the circuit court, 13th of November, 1867, where a decree was pronounced, declaring that the motion to dismiss the petition-as J. W. EL Townsend was not well taken, and that the probate of the will of Peter Townsend, Sr., at December term, 1858, and the letters “testamentary” granted thereon, having been made and granted more than thirty years after the death of the testator, were utterly null and void. To this action of the circuit court the defendants excepted, and prayed an appeal to this court, which was duly granted. -
■ Several questions have been discussed before us, which were, either directly or indirectly, discussed in the case of P. Townsend, Jr., v. J. W. H. Townsend, exr., above cited [4 Cold., 70], out of which this case arose.
1. It is insisted that the petitioners are strangers and not next of kin, and cannot be heard upon an application to set aside the probate. Whatever may be our opinion as- to the general rule of law involved in this abstract proposition, it is a sufficient answer to it to' say that leave was granted in the decree at Jackson, to' “the defendants,” to commence the proceeding, and all the facts were then before the court which are now before us, that are, in any way material, except the petition and application of Joseph W. II. Townsend to have his name stricken out, or not regarded in the petition. The only effect of this application is to relieve him from costs, as we are of opinion that, under the general leave granted, it was competent for the petitioners to use *207 Ms name. It would not have been a literal compliance with the order not to use it, and it was manifestly the intention that as it was held that the chancery court had no jurisdiction to set up the will or annul the probate, that that question should, in some form, be tried by proceedings to be instituted in the county court.
2. It is urged on the one side that the probate of the will was null and void because allowed more than thirty years after the death of the testator, while, upon the other, it is contended that the provision in the Code, sec. 2220,* applies only to letters of administration and not to' letters testamentary. But, in Townsend v. Townsend, 4 Cold., 81, it is expressly said, that the “terms seem to have been used as convertible terms in the statute, at least, so far as the limitation of time within which either may be granted after the death of the decedent, is concerned.” And it is further observed, p. 80, that “the fact that more than thirty years had elapsed since the death of the testator, and before the paper was offered for probate., can make no difference. The county court of Sumner county having assumed jurisdiction and admitted the paper to probate, its validity cannot be collaterally attacked and set aside in a court of equity.” The question as to whether the statute could be relied upon in an application to. ’the county court to set aside the probate, or in an issue devisavit vel non, was. not decided. Id., 82. Nor was it determined whether the fraudulent suppression of a will is within the equity of the statute,- or, rather1 should be regarded as suspending its operation; or, whether, as there is no saving in the statute as to fraud, the court can make an exception which the legislature has not seen fit to prescribe.- Neither do we determine this question, as its decision is not required by the facts of this case.
3. We concur in and adopt the view presented by the counsel for defendants to the petition, and hold that none *208 of our statutes of limitations, as to the probate of wills, apply to a case like this. The will purports tO‘ bear date 12th March, 1825, when there was no.statutes of limitations in this state on the subject. By the act of 1831, ch. 24, sec. 3, it was declared “that no letters of administration shall be granted in any case where the testator or intestate departed this life twenty years before application made for letters testamentary, or letters of administration, but all letters testamentary, or of administration, granted after the said period of twenty years, shall be utterly void and of nc effect.” Car. & Nich., 85. This was amended by the act of 1835, ch. 86, so as to declare it “lawful for administration to be granted at any time within thirty years from the death of said testator or intestate, to any persons entitled to distribution as aforesaid, who were infants or femes coveri at the time of the death of said testator or intestate.” Car. & Nich., 86. The second section of the act of 1842, ch. 69, which was passed to amend theact of 1831, ch. 31, provides “that nothing in this act shall be so construed as to authorize the issuance of letters of administration, or letters testamentary, after twenty years from the death of the testator or intestate.” Nich. Sup., 162. This was, again, amended by the act of 1854, ch. 97, p. 176, which declares that thereafter the period of ten years shall be given after the termination of a life, or any particular estate, to administer upon the estate of persons dying entitled to a vested or contingent remainder in property not vested in their possession during their lifetime.” These provisions, together with a special provision as to administration for the purpose of prosecuting any claim against the government of the United States, are, substantially, incorporated into said section 2220 of the Code,* and it is added in sub-sec. 4, that, “in no other case shall letters of adminstration be granted when the deceased died twenty years before application made for the same,” etc. In view of the constitutional pro *209 vision that “no retrospective law, or law impairing the obligation of contracts, shall be made,” and of the- propriety of holding, in all cases, where a contrary intention does not clearly appear, that it was not the design of the legislature to violate the constitution, we hold that the true intent and meaning of the various statutes, was, and is, that they only affect wills made after and not before their passage; and that the words, “in any case,” employed in the act of 1831, and “in no case,” used in the Code, as well as the other provisions of those statutes, apply alone to wills bearing date after their enactment. Although a will, as such, ordinarily takes effect only from the death of the testator, yet there are many cases ‘in which its provisions must, necessarily, relate back to, and be construed in connection with, its date, and in 'the case before us, if the will was made in 1825, rights accrued under it, which could not be impaired, restricted or destroyed by subsequent legislation. It has been well said that “it is a sound mle of construction to give a statute a prospective operation only, unless its terms show a legislative intent that it should have a retrospective effect.’.’
And some of the states have deemed it important to forbid such laws altogether by their constitutions. Cooley on Lim., 370. In another part of his work the same learned author says: “We shall venture also to express the opinion that a constitution is to be construed to operate prospectively only, unless its terms clearly imply that it should have a retrospective effect. This is the rule in regard, to statutes, and it is one of such obvious convenience and justice that it must always be adhered to in the construction of statutes, unless there is something in the- face of the enactment putting it beyond doubt that the legislature meant it to operate retrospectively. Retrospective legislation, except when designed to cure from all defects, or otherwise operate remedially, is commonly objectionable in *210 principle and apt to- result in injustice; and it is a sound rule of construction which, refuses lightly to imply an intent to enact it. And we are aware of no reasons applicable to ordinary legislation which do not, upon this point, apply equally as well to constitutions.” Cooley on Lim., 62, 63; Sedg. on Stat. and Const. Law, 190, 202, 406, 484.
While adopting these views in regard to the statutes, we are nevertheless of opinion that the will in question purporting to have been executed in 1825, before the passage of any of the statutes cited, is subject to the rule which existed independent of the statutes, “that the executor of a will proved in common form, may, at any time within thirty years, be compelled by a person having interest, to prove it, per testes, in solemn form.” See Burrow v. Ragland, 6 Hum., 486. In the previous case of Gibson v. Lane, 9 Yer., 479, the probate in common form was allowed to be set aside after a lapse of about eighteen years, and the court, without declaring what length of time would be sufficient, stated that it would be “certainly not less than twenty years.”
Adopting, by analogy, the term fixed for the probate in the Code, the time within which a probate may be set aside should be limited under the restrictions prescribed as to probate, to twenty or thirty years as to all wills made after the passage.
4. We have carefully considered the various cases decided by this court in regard to the probate of wills* so far as they appear to have any application to the question before us. See 6 Hum., 485; 7 Hum., 407; 11 Hum., 485; 3 Head, 635.
On a review of all the leading cases in this state, as well as other authorities, English and American, we hold that a motion to set aside the probate, of a will may be made on other grounds and for other purposes than to procure an isr sue devisavit vel non, and, in the language of Judge Reese, forms “the corpus of a legal contestation, proper to be set- *211 tied, finally, before the issue of devisavit vel non be tried, and it does not so incorporate and blend itself with the subsequent proceeding', if one should take place, as not to be separated from it and to be distinctly disposed of.” Wynn, ex’r., v. Spiers, 7 Hum., 407. See also Cornwell v. Cornwell, 11 Hum., 486; Johnson v. Gaines, 1 Cold., 290. And, it is also well settled, in those causes, that an appeal lies from the order of the county court refusing to1 annul the probate. It has been earnestly argued before us that the county court is not a court of general jurisdiction, and has no power or authority to set aside its own orders or decrees after the expiration of the term at which they are pronounced; and that this can only be done by writ of error coram nobis, or some other appropriate proceeding. This view is certainly favored in the opinions delivered by Judge Totten, 2 Swan, 165, where he says: “But has the county court any power to set aside and annul its order and judgment made at former term? We cannot see that it has, and, if it had, there can be no reason for its exercise.” Other authorities would seem to sustain the same position, but it can answer no good purpose to refer to, or review, them, as the right to make application, as well as the propriety of making and establishing it, is res adjudicated in Townsend v. Townsend [4 Cold., 70], where this identical suit was almost expressly directed. [See 9 Lea, 571-573; 6 Pickle, 69.]
5. The question still recurs, Did the circuit court err in reversing the judgment of the county court, refusing to set aside the probate? It has been seen that, as there was no statute in existence or in force in this state limiting the time within which a will executed in March, 1825, should be admitted to probate, the county court did not err in admitting the will of that date to be admitted to probate in 1858, unless the analogy which has restricted or shortened time at the common law to the state of affairs in this country, should limit the time to thirty years. It may be added *212 that it was correctly admitted to probate on the evidence of one of the subscribing witnesses, according to the act of 1789, ch. 23, Car. & Nich., 708, and the Code, sec. 2171,* as it was not contested and the probate was in common form merely. Such probate was almost a matter of course. But, when the application was made to set aside the probate, and the entire record in the chancery cause at Covington, and the supreme cause at Jackson was before the county court, the aspect of the case was greatly changed, and a question of no little novelty as well as momentous importance, was presented.
There is not, and never was, any statute in this state prescribing the time within which the grant of administration, or the probate of a will may be recalled or annulled. It is said by a recent author of high standing and just celebrity, that “where there is no express statutory provision giving jurisdiction to some superior court, in petitions for reviewing or revising of the decrees of probate courts, it pertains to those courts as one of the necessary incidental powers of all tribunals, not infallible, to entertain petitions, under reasonable conditions and for sufficient grounds alleged therein, for the purpose of revising or reconsidering their own decrees.” 2 Bedf. on Wills, 67. In I Williams on Ex., 5th Am. ed., 509, 510, margin, it is said: “It seems, indeed, to- have been formerly holden in some cases, that if the ordinary, since the statute, had ever granted administration, he could not otherwise revoke or repeal it on any ground, for, it was said, that, having once executed his power, he had nothing further to do in the affair. But, notwithstanding these opinions, it is now agreed that the administration, though granted to a next of kin, may be repealed by the ordinary, not arbitrarily, yet when there shall be just cause for so doing.” See also 4 Bouv. Bac. Ab., 60, 61, (E) 12; Will, on Ex., 236. In 2 Redf. on Wills, it is said: “It is now conceded that, for good causes, *213 the ecclesiastical courts may repeal a grant of administration, and the temporal courts may judge of the sufficiency of the, cause.” 2 Redf. on Wills, 105. Although this language quoted refers, literally, to the revocation of letters of administration, we hold that the principles stated, and the reasons given, apply as well to a motion to set aside the prohate of a will. It has been seen that, while it is the English practice to obtain probate in solemn form by a citation of the executors, and that, if the will is not sufficiently proved, the probate will be revoked, and while it has been common in this state to effect the same result by an issue devisavit vel non, yet if the practice of moving to set aside the probate in the county court has also been sanctioned, independently of the question as to the proper factum of the will itself, such motions should always be founded on due and sufficient cause-, and the probate of a will, even in common form, should not be set aside rashly or without adequate reason. But the relief, if any, to' which the petitioners are entitled could not, probably, be attained upon an issue devisavit vel non, and, therefore, they state explicitly that they make no such application. Were it granted, the inquiries of the jury would, doubtless, be limited to questions connected with the due and proper execution of the will, as for example, whether it was signed by the testator and witnessed in his presence and at his request, and whether’ he was of sound mind and disposing memory, and had never done any act amounting to a revocation. The determination of the issue devisavit velnon, involving these and kindred questions, would, by no means, determine the question whether the probate should be set aside. But clothed as we are, by the appeal, with the jurisdiction and authority of the county court, and looking to all the circumstances in proof before that tribunal, when the application was made to annul the probate, we hold that the county court should have set it aside, not for the precise causes alleged in the judgment of the cir *214 euit court, but for varous other reasons-which we proceed to state, briefly, in view of the magnitude of the cause and the earnestness and ability with which it has been argued.
We are, by no means, convinced that the will ever was, in point of fact, suppressed, or that the mother of those who insist upon the setting up of the will, or her second husband, wei'e guilty of the gross and outrageous fraud which has been ascribed.to them. It is in proof that, although she was an illiterate -woman, she and her husband each sustained, through life, an irreproachable character. Thomas Stone, the subscribing witness, upon whose evidence the will was admitted to probate, when interrogated, in tire progress of the chancery suit, as to whether he had' ever communicated to either of the complainants his knowledge of the fact that a will had been executed, said that “he might have done it,” or “might not have done it;” and added that “the impression was made on my mind that she had dissented from the will.” John Wilkes, another witness, who had been requested by Townsend, the testator, to witness his will, and afterwards declined to become Mrs. Townsend’s security as administratrix, states that shortly after the death of the testator*, there was a rumor afloat in the neighborhood that his widow had dissented from the will, and although this evidence was objected to, and such proof is, in general, inadmissible, it cannot, perhaps, be wholly disregarded, after the'lapse of thirty-three years, as tending to show the character in which the widow acted and held the property. Peter W. Stone, a witness for the complainants, states that he “came here in 1831, and being related to the children, felt some interest about the mother, and was making inquiry about the property, and learned from report, that there was a will and that the widow had dissented from it and took a child’s part of the property.” This statement was made without objection by either side. The existence of the will was known at the time of its execution, to the two subscribing witnesses and to John "Wilkes *215 and L. D. "Wynne^ and it is not probable that Dr. Booker, who is shown to have been a physican and a man of intelligence, and Mrs. Townsend, would conspire together, either before or after their marriage, to commit a felony, by the destruction of the will, or to perpetrate a fraud by obtaining letters of administration and guardianship. It is shown by the proof that the widow obtained nothing more than her dower and distributive share, and that all the heirs received and disposed of their equal shares of the real and personal estate, and that all this was done a number of years before the bill was filed, and acquiesced in by all the heirs for a number of years after they, severally, attained their majority.' If the existence of a grant for land is presumed after twenty years continuous and uninterrupted possession; if payment of a bond, while the distinction continued between sealed and unsealed instruments, was presumed in sixteen years; and if seven years uninterrupted adverse, possession of land under a deed or color of title, no matter how defective, will vest the fee in the possessor, may we not presume that a widow, who was either personally, or through those who bought her interest, in possession of her dower for thirty-three years, and had held it and her distributive share openly, notoriously, adversely and publicly, was rightfully in possession?
May it not be presumed that as the act of 1784, ch. 22, Car. & Nich., 262 [Shannon’s Code, sec. 4146], does not prescribe the manner in which her dissent from her husband’s will shall be made known, but simply declares that she shall signify it in open court, that her dissent was signified in due time, and that the record has been lost, or that through ignorance, or in the hurry of business, or by some clerical omission or oversight, the county court failed to cause this action to be entered upon their minutes? And can this strong and irresistible presumption be overcome after the lapse of thirty-three years, or shall dishonor and infamy becloud or destroy the memory of the dead upon *216 the evidence of witnesses not altogether disinterested or without feeling or bias, deposing to conversations which are said to have occurred more than thirty years before their depositions were taken, or to- casual declarations snatched from the trembling lips of a feeble old woman, tottering to the grave and agonized with the reflection that her own children, bone of her bone, and flesh of her flesh, were seeking with parricidal hands to- wrench from her the last vestige of property and to repair their broken fortunes by the ruin of her character?
The swiftest witnesses against the old lady and Dr. Booker is one L. B. Wynne, whose credibility on oath, is assailed by twelve, and sustained by seventeen, witnesses, and who, in this attitude, must be regarded at least as a witness of doubtful veracity. He states that Peter Townsend, the testator, was his guardian; that he lived with him twelve or thirteen years; that he was present at the execution of his will, etc.; that he read it; that, afterwards in watermelon time, in 1827, “he read the will again, once or twice; that Mrs. Booker, formerly Mrs. Townsend, and her husband had a difficulty in regard to her first children, and separated about three weeks; that she brought the will to his house, and in answer to his question why she did so, said that, in selectng out papers belonging to her deceased husband’s estate, which were of no use, the will had been thrown out with them by Dr. Booker and John Lauder-dale; that she was directed to- bum them and that she found the will among the papers; that witness then asked her how she knew the will, as she could neither read nor write; that she replied she had put a mark on it not long after it was written, by which she knew it; that if she never went back, she intended her children should have all the property •according to the will; that witness and his wife persuaded her to return to- her husband; that she carried the will back and asked him “to say nothing to nobody” about her having the will. The witness states that in an altercation shortly *217 afterwards with Dr. Booker, whose overseer he was, he told him, among other things, that if he did not let him alone he would inform the heirs of the existence of the will, and was interrupted by him no more; and that he, the witness, said nothing about- the will, except to his wife, until inquired of by the heirs since the commencement of this suit. The silence of the witness under such circumstances and for so great a length of time, as well as his apparent want of moral sense, are as suspicious as his character is shown to be in the record, and but little importance, if any, is to be attached to his statements. ,
B. L. Wynne states that he had a few words of conversation with Mrs. Booker on the subject of her first husband’s will, after the commencement of this suit, and a month or so previous to her death. “That he asked her if she was going to get anything by dissenting from the will of the doctorj that she said she did not know, for the will of her first husband, Peter Townsend, was found; that J. W. H. was sued; and she then told witness that John Lauderdale and Dr. John Booker had given her the will and told her to burn it.” The witness said that some member of the family came into the room and the conversation ceased. It is sufficient to remark in regard to> the evidence of the witness, that he is the father of Thomas and Peter Wynne, twoi of the complainants; that he was afterwards cross-examined; that, upon his cross-examination, he was interrogated as to a conversation with W. D. Austin and P. Stone, at the courthouse in Gallatin, during the October term, 1858, of the court, in which he stated that John Lauderdale handed the will of Peter Townsend to him, and that he kept it several years; that he denied the conversation and said the paper handed him was G. W. W. Townsend’s will; that his answer is fully and distinctly disproved by W. D. Austin, Peter W. Stone and Bichard W. Stone, with whom he had the' conversation, and by David P. *218 Byrne, to whom he said he had known the. existence of the will twelve or fifteen years.
Without reviewing all the testimony, the most frank and consistent statement in regard to the will appears to be contained in the answer and the amended answer of Joseph W. LI. Townsend, son of Peter Townsend, the testator, and executor and son-in-law of Dr. Booker. He denies, in response to the allegations of the bill, that Dr. Booker and his wife, or either of them, suppressed or concealed the existence of the will. He states, in substance, that early in 1829, a small bag or pillowslip, came into' his possession, which his mother said were the old papers of his deceased father; that he preserved them out of respect to his memory, and laid them away in a small desk, where they remained until he removed from Sumner to Tipton county, in 1846; that he left the desk containing the papers, for the use of his son, who was going to school, where it remained until 1849, when it was removed to Tipton county by complainant, Peter Townsend, who made the impression upon defendant’s mind that he had found the will in the desk. The respondent, further answering, states that his mother told him, after the death of her second husband, and after the will was found, that shortly after the death of her former husband, John Booker and John Lauderdale came to- her house to. look over the papers belonging to the estate of P. Townsend, Sr.; that after an examinaton of them, they placed them in two piles, and pointed to one of the piles as valuable papers, and to the other as worthless, remarking that she might take and bum, or destroy, the latter, but that she had placed them in the bag or pillowslip. The said Joseph W. H. states in his deposition, that he first saw the- will in Gallatin, in 1860, and in his amended answer and deposition, makes further statements not necessary to be here recited.
No reasonable doubt can exist, in view of the statements of Mary J. Stone, and other witnesses, that Mrs. Booker *219 had full knowledge of the existence of her first husband’s will, before his death,- and was, probably, at first, satisfied with it, but the evidence utterly fails to satisfy our minds that she and Dr. Booker either concealed or attempted to destroy the will. If it had been the purpose of either to perpetrate a fraud by the suppression or destruction of the will, they could easily have accomplished their purpose, but the probabilities are, first, that the widow dissented from the will; and, secondly, that after the just and fair distribution of the estate, they both regarded the will as of no intrinsic value. It is not reasonable to presume that Mrs. Booker would have handed the will to her son, about four years after her husband’s death, either with or without calling his attention to its existénce, if she had any criminal intent and knew that she had forfeited her right to the provisions of the will by her second marriage, and could be at any time deprived of her dower and distributive share. Her neglect or unwillingness to burn the will, taken in connecton with her full knowledge of the existence of the will, and her open and public enjoyment of property and rights inconsistent with its provisions, furnishes a conclusive presumption of her innocence and integrity, and rescues her memory from the obloquy cast upon it by the unlineal und unnatural complainants in the' bill. It cannot, with propriety, be said that the will was concealed or suppressed by the fraud of Mr. and Mrs. Booker, when they never denied or feared its existence, regarded it as worthless paper, and actually placed it in the hands of one of the devisees and legatees most interested in propounding it for probate.
It appears from the record that Peter Townsend, the youngest child, attained his majority about seventeen year’s before the.probate of the will. He is one of the complainants, and had knowledge of the existence of the will from fifteen to twenty years before its probate.. The lapse of so long a period furnishes conclusive evidence of acquiescence *220 in tbe administration and partition of the estate, and of the abandonment of all claim under the will. To disturb' the settlement of the estate after it had been finally settled for thirty years, would give rise to unnecessary, protracted and unjust litigation, and would sanction the enormous account of fifty-one thousand dollars, with its pyramids of interest, reported in the chancery court. No valid reason exists why the tardy probate of the will should be permitted to stand. On the contrary, the repose of society, the peace of families, the security of titles, the respect due to an administration of the estate conducted according to the strictest forms of law, as well as the great danger of irreparable and irremediable injustice, demand that the probate of the will shall be set aside, and that all parties shall be bound by the settlement made in the county court.
Let the judgment of the circuit court be affirmed, and let this case be remanded to the county court, with directions to that court to enter upon its minutes a judgment in favor of the petitioners, setting aside the probate of the will; and let the costs of this cause, in this court and the county and circuit courts, be adjudged against the defendants to the petition.

 Shannon’s Code, sec. 3955.

 Shaiuion’s Code, sec. 3955.

Shannon’s Cod.e, sec. 3904.

Sharmon’s Code, sec. 3955.